1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11   DOUGLAS PILCHER,

| | |
|---|---|
| Case No. 1:24-cv-00854-CDB | |

12              Plaintiff,

ORDER GRANTING IN PART MOTION TO
STAY PROCEEDINGS AND COMPEL
ARBITRATION

13        v.

14   CARMAX AUTO SUPERSTORES,
     INC.,

(Doc. 5)

15
                   Defendant.
16

17          Plaintiff Douglas Pilcher ("Plaintiff") initiated this putative class action with the filing of a

18   complaint on May 29, 2024, against Defendant CarMax Auto Superstores, Inc. ("Defendant" or

19   "CarMax") in the Superior Court of California, County of Kern, with the assigned case number

20   BCV-24-101786.  (Doc. 1).  On July 24, 2024, Defendant removed the action to this Court.  (*Id.*).[1]

21   Plaintiff asserts that CarMax violated the California False Advertising Law, Cal. Bus. & Prof. Code

22   §§ 17500, *et seq.* ("FAL") and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§

23   17200, *et seq.* ("UCL") by allegedly failing to perform advertised 125+ point inspections of three

24   vehicles Plaintiff purchased from CarMax.  (*Id.* at ¶ 10).  Plaintiff seeks on behalf of himself and

25   the putative class members preliminary and permanent injunctive relief, disgorgement, restitution,

26   and damages.  (*Id.* at ¶ 13).

27

28   ─────────────────────
     [1] The parties have consented to the jurisdiction of the United States Magistrate Judge and this action
     has been assigned to Magistrate Judge Christopher D. Baker for all purposes.  (Doc. 9).

1    Pending before the Court is Defendant's motion to stay proceedings and compel arbitration,

2    filed on July 31, 2024.  (Doc. 5).  Plaintiff filed an opposition on August 14, 2024, and Defendant

3    filed its reply on August 23, 2024.  (Docs. 7, 10).  On September 5, 2024, the Court deemed the

4    motion suitable for disposition without hearing or oral argument and vacated the motion hearing

5    set for September 19, 2024.  (Doc. 11).  Case management dates have not been scheduled pending

6    the Court's resolution of Plaintiff's motion.

7    **I.        BACKGROUND**

8            Plaintiff alleges that he purchased three vehicles from CarMax that were advertised as

9    having undergone CarMax's 125+ point inspection that, in fact, did not receive the inspection.

10   (Doc. 1 at ¶ 12); (Doc. 1-1 at ¶¶ 19, 21, 28, 35).  On September 22, 2023, Plaintiff finalized his

11   purchase of the first vehicle, a used 2013 Lexus RX350 F-Sport vehicle, from CarMax.  (Doc. 1-1

12   at ¶ 19); (Doc. 5 at 3-4).  Following several issues discovered with the first vehicle, including the

13   need to replace the transmission, Plaintiff elected to return the first vehicle on October 23, 2023.

14   (Doc. 1-1 at ¶¶ 22–27).  That same day, Plaintiff purchased his second vehicle, an Acura RDX,

15   from CarMax.  (*Id.* at ¶ 28).  The second vehicle was advertised as an all-wheel drive vehicle that

16   had undergone the 125+ point inspection and deep clean.  (*Id.*).  Upon discovering the second

17   vehicle was not an all-wheel drive vehicle as advertised on December 26, 2023, and following a

18   series of issues since the purchase, Plaintiff returned the second vehicle to CarMax.  (*Id.* at ¶¶ 29–

19   34).  On December 28, 2023, Plaintiff purchased his third vehicle from CarMax, a 2015 Mercedes

20   GLA 350 4Matic, which Plaintiff noticed had issues including a faulty door motor and missing a

21   second key.  (*Id.* at ¶ 35).  CarMax promised Plaintiff to fix these issues and other issues discovered

22   since the purchase, including a broken sunroof and weather seal damage.  (*Id.* at ¶ 36).  On January

23   10, 2023,[2] CarMax informed Plaintiff it was unable to repair the sunroof and must send the third

24   vehicle elsewhere for repair.  (*Id.* at ¶ 37).  Plaintiff alleges the third vehicle was held over 50 days,

25   taking the purchase outside of both the 30-day return window and the 90-day warranty period.  (*Id.*

26   at ¶ 38).

27          Plaintiff disputes the validity of CarMax's representations that the 125+ point inspections

28
_____

[2] Although the complaint refers to 2023, it appears Plaintiff may have intended to refer to 2024.

were completed in light of the several issues he faced from the purchase of the three vehicles.  (*Id.* at ¶¶ 38–39).  Thus, Plaintiff seeks to represent a putative class of customers who have purchased a vehicle from CarMax that was subject to CarMax's advertising of the 125+ point inspection at the time of sale.  (Doc. 1 ¶ 12).

As part of the transactions for the first and second vehicles, Plaintiff signed retail installment contracts.  (Doc. 5 at 3-4); (Doc. 5-1 at Exhs. A, B).  As part of the third vehicle transaction, Plaintiff signed a used vehicle bill of sale ("BOS").  (Doc. 5 at 4); (Doc. 5-1 at Ex. C).  Each contract includes an agreement to arbitrate, set forth in capitalized and bold text:

> **IF YOU OR WE CHOOSE ARBITRATION, THEN ARBITRATION SHALL BE MANDATORY, AND:**
>
> - **ANY CLAIM WILL BE DECIDED BY ARBITRATION AND NOT IN COURT OR BY A JURY TRIAL.**
> - **DISCOVERY AND RIGHTS TO APPEAL ARE LIMITED BY THE ARBITRATION RULES OF THE ARBITRATION ADMINISTRATOR.**
> - **YOU GIVE UP YOUR RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF A CLASS IN A CLASS ACTION ("CLASS ACTION WAIVER").**
> - **OTHER RIGHTS THAT YOU OR WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

(Doc. 5 at 4-5); (Doc. 5-1 at Ex. A at 2-4 (Declaration of Kenny Elvira ("Elvira Decl.")), 9; Ex. B at 14; Ex. C at 17-18).  The arbitration agreement also describes the types of disputes subject to arbitration:

> **What Claims are Covered.**  A "Claim" is any claim, dispute or controversy between you and us that in any way arises from or relates to this consumer credit sale, the purchase you are financing by way of this contract, the Vehicle and related goods and services that are the subject of the purchase and this Contract, or the collection or servicing of this Contract, including but not limited to:
>
> - Initial claims, counterclaims, cross-claims and third-party claims;
> - Disputes based on contract, tort, consumer rights, fraud and other intentional torts (at law or in equity, including any claim for injunctive or declaratory relief);
> - Disputes based on constitutional grounds or on laws,

regulations, ordinances or similar provisions; and
- Disputes about the validity, enforceability, arbitrability or scope of this Arbitration Provision or this Contract, subject to paragraph (f) [the "class action waiver paragraph"] of this Arbitration Provision.

(*Id.*).  The class action waiver paragraph provides:

> **Class Action Waiver.  You give up your right to participate in a class action.  This means that you may not (i) be a representative or member of any class of claimants, (ii) or act as a private attorney general, except to seek public injunctive relief expressly authorized by statute.**  Further, unless both you and we agree otherwise, the arbitrator may not consolidate more than one person's Claim or Claims.  Notwithstanding any other part of this Arbitration Provision, the validity and effect of the Class Action Waiver must be determined only by a court and not by an arbitrator.  If a court limits or voids the Class Action Waiver, then this entire Arbitration Provision (except for this paragraph) will be null and void.

(*Id.*) (emphasis in original).   The arbitration agreement provides the Federal Arbitration Act ("FAA") as the governing law of the provision.  (Doc. 5 at 5); (Doc. 5-1 at Ex. A at 9; Ex. B at 14; Ex. C at 17-18) ("This Arbitration Provision is governed by the [FAA] and not any state arbitration law.").  The arbitration agreement also provides for choosing the arbitration administrator.  (*Id.*) ("If you initiate the arbitration proceeding, you may choose either of the following arbitration Administrators: (1) American Arbitration Association [("AAA")] . . . or (2) JAMS[.]").  Plaintiff's signature appears on each of the vehicle contracts containing the arbitration agreement.  (Doc. 5 at 5); (Doc. 5-1 at Ex. A at 6-9; Ex. B at 11-14; Ex. C at 16).

## II.       APPLICABLE LEGAL STANDARDS

The Federal Arbitration Act ("FAA") applies to arbitration agreements in any contract affecting interstate commerce and "governs the allocation of authority between courts and arbitrators."  *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008); 9 U.S.C. § 2. The FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  This provision "create[s] a body of federal substantive law of arbitrability applicable to any arbitration agreement within the coverage of the Act."  *Moses H. Cone Mem'l Hosp. v. Mercury*

4

1    *Constr. Corp.*, 460 U.S. 1, 24 (1983).  The FAA establishes "a liberal federal policy favoring

2    arbitration agreements."  *Epic Sys. Corp v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quotation and

3    citation omitted); *see Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008)

4    (Congress enacted the FAA "to replace judicial indisposition to arbitration").  A party seeking to

5    enforce an arbitration agreement may petition the Court for "an order directing the parties to

6    proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.

7      A court may grant a motion to compel arbitration only upon resolution of two "gateway"

8    questions: (1) "whether there is an agreement to arbitrate between the parties; and (2) whether the

9    agreement covers the dispute."  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  "If

10   the response is affirmative on both counts, then the [FAA] requires the court to enforce the

11   arbitration agreement in accordance with its terms."  *Chiron Corp. v. Ortho Diagnostic Sys.*, 207

12   F.3d 1126, 1130 (9th Cir. 2000).

13     Because the FAA "is phrased in mandatory terms," "the standard for demonstrating

14   arbitrability is not a high one, [and] a district court has little discretion to deny an arbitration

15   motion."  *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991).  Still, a

16   court may compel arbitration only when there is a "clear agreement" to arbitrate between the

17   parties.  *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092–93 (9th Cir. 2014) (citations omitted).

18   "When determining whether a valid contract to arbitrate exists, we apply ordinary state law

19   principles that govern contract formation."  (*Id.* at 1093) (citing *Ferguson v. Countrywide Credit

20   Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002)). "If the court finds a valid arbitration agreement

21   exists, the court must order the parties to proceed to arbitration in accordance with the terms of the

22   agreement."  *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1013 (9th Cir. 2024) (internal

23   citation and quotation omitted).

24     Gateway issues such as validity and arbitrability may be delegated to the arbitrator.  *Momot

25   v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011) (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S.

26   63, 68-70 (2010)); *Bennett v. Anheuser-Busch Commercial Stratefy, LLC*, No. 2:22-CV-01239-

27   MCE-KJN, 2024 WL 1241916, at *4 (E.D. Cal. Mar. 22, 2024).  "[A]ny doubts concerning the

28   scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp.*,

460 U.S. at 24–25.  As a result, arbitration should only be denied when "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

It is well-established that "arbitration provides a forum for resolving disputes more expeditiously and with greater flexibility than litigation." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1011 (9th Cir. 2004).  However, the presumption in favor of arbitration applies only when determining the scope of arbitrable *issues* but not which *parties* agreed to arbitrate.  *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995) (holding the presumption for arbitration "reverses" when determining whether certain parties are subject to arbitration in cases of "silence or ambiguity").  "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Kaplan*, 514 U.S. at 939 (internal quotation and citation omitted).

In evaluating a motion to compel arbitration, the district court must apply the summary judgment standard outlined in Federal Rule of Civil Procedure 56.  *See Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 831 (9th Cir. 2022); *Hansen v. LMB Mortg. Servs., Inc*., 1 F.4th 667, 670 (9th Cir. 2021).  "The summary judgment standard is appropriate because the district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Hansen*, 1 F.4th at 670 (internal quotation marks and citation omitted).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The moving party bears the burden of demonstrating the existence of an arbitration agreement.  *Prostek v. Lincare Inc.*, 662 F. Supp. 3d 1100, 1110 (E.D. Cal. 2023).  A defendant may meet its "initial burden to show an agreement to arbitrate" merely "by attaching a copy of the arbitration agreement purportedly bearing the opposing party's signature" to the motion to compel arbitration.  *Espejo v. S. Cal. Permanente Med. Grp.*, 245 Cal. App. 4th 1047, 1060 (2016).  However, if a plaintiff "challenge[s] the validity of that signature," a defendant is "then required to

1    establish by a preponderance of the evidence that the signature [is] authentic." (*Id.*).

2          "When a federal court finds that a dispute is subject to arbitration, and a party has requested

3    a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the

4    suit on the basis that all the claims are subject to arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 475-

5    76 (2024) (citing 9 U.S.C. § 3) (providing that, when any issue in a suit is subject to arbitration, the

6    court shall stay the action upon request by a party until arbitration is completed).

7    **III.    DISCUSSION**

8          Defendant seeks to compel arbitration and stay the case because: (1) Plaintiff entered into a

9    valid and enforceable arbitration agreement supported by mutual consent and consideration for the

10   purchase of three vehicles from Defendant, and as part of that valid agreement, Plaintiff agreed to

11   waive his right to participate in a class action, either by serving as a representative or a class

12   member; (2) the parties expressly chose an arbitrator, not a court, to determine any issues of

13   arbitrability; (3) even if the Court were to reach the issue of arbitrability—review of which

14   Defendant contends is specifically reserved for the arbitrator—Plaintiff's claims fall within the

15   scope of the parties' arbitration agreement; and (4) the Court is required to stay the case pending

16   the conclusion of the parties' arbitration as set forth in *Smith, supra*. (Doc. 5 at 3).

17         Plaintiff opposes Defendant's motion solely on the grounds that his class action claims seek

18   the award of "public injunctive relief," and "as a matter of California law, it is illegal for a company

19   to attempt to contract away a right to seek public injunctive relief." (Doc. 7 at 1-2).

20         In reply to Plaintiff's argument, Defendant counters that Plaintiff fails to assert a claim for

21   public injunctive relief in the complaint, and only seeks injunctive relief solely on behalf of himself.

22   (Doc. 10 at 2).  Defendant separately argues that the arbitration agreement at issue expressly

23   exempts claims for public injunctive relief from mandatory arbitrability, and even if Plaintiff had

24   asserted a claim for public injunctive relief, that claim would not preclude arbitration for all of

25   Plaintiff's other, individual claims. (*Id.* at 2).

26         The parties do not contest the FAA's applicability over the arbitration agreement at issue

27   here. *See* (Doc. 5 at 6); (Doc. 7 at 3-4).  Thus, the Court follows the FAA's two-step inquiry in

28   ruling on Defendant's motion to stay the proceedings and compel arbitration.

1          **A.      Validity of the Arbitration Agreement**

2          First, in determining whether to grant Defendant's motion to compel arbitration, the Court

3   considers the initial "gateway" question—whether there is an agreement to arbitrate between the

4   parties. *Brennan*, 796 F.3d at 1130. "When determining whether a valid contract to arbitrate exists,

5   we apply ordinary state law principles that govern contract formation." *Davis*, 755 F.3d at 1093

6   (citation omitted).  Here, the parties do not dispute that California law governs the contracts at

7   issue. *See* (Doc. 1-1 ¶¶ 15, 20, 23, 28, 35); (Doc. 5 at 6); (Doc. 7 at 4-5).  To form a contract under

8   California law, the parties must mutually assent to the terms of the agreement. *Berman*, 30 F.4th

9   at 855.

10          Nor do the parties dispute that an agreement to arbitrate exists.  Plaintiff entered the

11   contracts for the purchase of the three vehicles at issue from Defendant.  (Doc. 1-1 ¶¶ 19, 23, 28,

12   35); (Doc. 5 at 6-7); (Doc. 5-1 Ex. A at Elvira Decl. ¶¶ 6–12, 9; Ex. B at 14; Ex. C. at 16-18).

13   Plaintiff's signature appears throughout each of the three contracts, including his initials adorned

14   on the arbitration agreement pages of the two retail installment contracts.  (*Id.*); *Espejo*, 245 Cal.

15   App. 4th at 1060.  Plaintiff does not challenge the validity of his signatures to the contracts.  (*Id.*).

16   Plaintiff only disputes that his purported claim for public injunctive relief is exempt from arbitration

17   under the California Supreme Court's decision in *McGill* and by the express terms of the agreement

18   acknowledging that such claims are not subject to "mandatory" arbitration.  (Doc. 7 at 5) (citing

19   *McGill v. Citibank, N.A.*, 2 Cal.5th 945 (2017)) (discussed *infra*).  Thus, the Court finds that the

20   first prong is met and a valid agreement to arbitrate exists between the parties. *Brennan*, 796 F.3d

21   at 1130.

22          Having found a valid arbitration agreement exists, the Court next turns to whether the

23   arbitration agreement is enforceable as to Plaintiff's claims, including his class action claims

24   purportedly seeking public injunctive relief. *Brennan*, 796 F.3d at 1130.

25          **B.      Enforceability of the Arbitrability Agreement**

26          Once the moving party has shown the existence of a valid agreement to arbitrate, the party

27   resisting arbitration bears the burden of proving the dispute does not fall within the scope of the

28   arbitration provision, *see Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000),

1    bearing in mind that doubts concerning the scope of arbitrable issues should be resolved in favor

2    of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25.

3                    *1.    Delegation of Arbitrability*

4            Because the Court has already found that the parties formed a valid arbitration agreement,

5    the question that remains is whether there is a valid agreement to delegate the issue of scope to the

6    arbitrator.  As discussed above, gateway issues, including scope, may be delegated to the arbitrator.

7    *See, e.g., Bennett*, 2024 WL 1241916 at *4.  The arbitration agreement at issue provides for

8    choosing the arbitrator.  (Doc. 5-1 at Ex. A at 9; Ex. B at 14; Ex. C at 17-18) ("If you initiate the

9    arbitration proceeding, you may choose either of the following arbitration Administrators: (1)

10   American Arbitration Association [("AAA")] . . . or (2) JAMS[.]").  The arbitration agreement also

11   appears to delegate issues of arbitrability and scope to the arbitrator.  (Doc. 5-1 Ex. A, Elvira Decl.;

12   Ex. B, 14; Ex. C, 17) ("**What Claims are Covered**. . . . Disputes about the validity, enforceability,

13   arbitrability or scope of this Arbitration Provision or this Contract, subject to paragraph (f) [the

14   "class action waiver paragraph"] of this Arbitration Provision.") (emphasis original).

15           "When the parties' contract delegates the arbitrability question to an arbitrator, the courts

16   must respect the parties' decision as embodied in the contract."  *Henry Schein, Inc. v. Archer &*

17   *White Sales, Inc.*, 586 U.S. 63, 65 (2019).  If the contract "clear[ly] and unmistakab[ly]" delegates

18   this question to the arbitrator, . . . a court may not override the contract[.] In those circumstances,

19   a court possesses no power to decide the arbitrability issue."  *Silverman v. Move Inc.*, No. 18-cv-

20   05919-BLF, 2019 WL 2579343, at *8 (N.D. Cal., June 24, 2019) (citing *Henry Schein, Inc.*, 586

21   U.S. at 68).  *See* Rent-A-Center, 561 U.S. at 72 (where express delegation clause exists, unless a

22   party opposing enforcement of the agreement specifically challenges the delegation clause, courts

23   must treat it as valid).

24           Defendant asserts that "[b]ecause a valid Arbitration Agreement exists and delegates issues

25   of arbitrability to the arbitrator, the Court does not have jurisdiction to decide whether Plaintiff's

26   claims fall within the scope of the Agreement."  (Doc. 5 at 8).  Defendant asserts that the section

27   of the arbitration agreement that defines the scope of the covered claims provides that any

28   "[d]isputes about the validity, enforceability, arbitrability or scope of this Arbitration Provision or

                                                     9

1    this Contract" are subject to arbitration.  (*Id.*); (Doc. 5-1 Ex. A, Elvira Decl.; Ex. B, 14; Ex. C, 17).

2    Defendant further asserts that "[i]t is therefore the arbitrator, rather than the Court, to decide

3    whether the Arbitration Agreement covers Plaintiff's individual claims against CarMax."  (Doc. 5

4    at 8).   Defendant argues that "[e]ven if the parties' Arbitration Agreement did not require

5    arbitrability issues to be decided by the arbitrator, Plaintiff's individual claims are nevertheless

6    covered by the Arbitration Agreement."  (Doc. 5 at 9).  Defendant asserts that Plaintiff's claims fall

7    within the scope of the arbitration agreement, which expressly covers "any claim, dispute, or

8    controversy . . . that arises from or relates to . . . the Vehicle and related goods and services[.]"

9    (*Id.*).  Defendant contends the arbitration agreement includes any "[d]isputes based on contract,

10   tort, consumer rights, fraud and other intentional torts[,]" which encompass Plaintiff's allegations

11   that Defendant falsely advertised it performed a 125+ point inspection on each of the vehicles

12   Plaintiff purchased and that Defendant engaged in fraudulent and/or unlawful business practices in

13   violation of the UCL.  (*Id.*).  Defendant contends that these individual claims are encompassed by

14   the plain language of the arbitration agreement and, "even if the issue of arbitrability was before

15   the Court, Plaintiff cannot show any permissible interpretation of the Arbitration Agreement that

16   would permit his claims to proceed in this Court."  (*Id.* at 10).

17        Plaintiff makes no argument in response to the issue of delegation of arbitrability and

18   premises his opposition on the purported public injunctive nature of his class action claims such

19   that the claims are precluded from arbitration.  (Doc. 7 at 8-9) ("[The] arbitration provision

20   expressly excludes claims for which Plaintiff seeks public injunctive relief, such as the UCL claims

21   included in Plaintiff's Complaint, from being compelled to arbitration.").  Because Plaintiff does

22   not *specifically* challenge the delegation clause, this Court treats it as valid, leaving any challenge

23   to the validity of the agreement as a whole for the arbitrator.  *See Rent-A-Center*, 561 U.S. at 72.

24        Because the Court has already found that a valid arbitration agreement exists and appears

25   to include language requiring the issues of arbitrability and scope to be arbitrated, the Court finds

26   that Plaintiff's individual claims are subject to arbitration.  The remaining question is whether

27   Plaintiff's class action claims purportedly seeking public injunctive relief are precluded from

28   arbitration.

1                          2.        *Plaintiff's Claims Are Within the Scope of the Arbitration Agreement*

2        Plaintiff asserts that "Defendant cannot compel arbitration in an action seeking public

3  injunctive relief, and their own arbitration agreement admits as much." (Doc. 7 at 4). Plaintiff

4  asserts that "[i]t is well-established by binding California Supreme Court precedent that public

5  injunctive relief claims brought in the context of a class action for the benefit of the general public

6  cannot be compelled to arbitration." (*Id.* at 1-2) (citing *McGill*). Plaintiff contends that the

7  arbitration provisions at issue state explicitly "[a]rbitration is not mandatory for any claim for which

8  you seek public injunctive relief expressly authorized by statute." (*Id.* at 3); (Doc. 5-1 at Ex. A at

9  9; Ex. B at 14; Ex. C at 17-18). Thus, Plaintiff contends that "even by the terms of the very

10 agreement Defendant is seeking to enforce, arbitration cannot be granted for Plaintiff's UCL claims

11 which provide for public injunctive relief, and for which he seeks public injunctive relief, as alleged

12 in his Complaint." (Doc. 7 at 3).

13       Defendant argues in the reply that Plaintiff's complaint does not assert a claim for public

14 injunctive relief, and to the contrary, seeks only individual injunctive relief. (Doc. 10 at 2)

15 ("Plaintiff's only mention of injunctive relief comes in Paragraph 77 of the Complaint, yet that

16 Paragraph makes no mention of a public injunction."). Defendant asserts that, in any event, the

17 arbitration agreement conforms with California case law because it does not purport to bar public

18 injunctive relief whatsoever. (*Id.*) ("[T]he Arbitration Agreement expressly states that claims for

19 public injunctive relief are *not* subject to arbitration at all.") (emphasis original). Lastly, Defendant

20 concedes that even if Plaintiff had asserted a claim for public injunctive relief, that claim would not

21 preclude arbitration of all his other individual claims. (*Id.*) ("Indeed, Plaintiff makes no argument

22 that the individual claims are not arbitrable.").

23                        a.       The *McGill* Rule Does Not Apply

24       "California's legal requirement that contracts allow public injunctive relief is known as the

25 *McGill* rule." *DiCarlo v. MoneyLion, Inc.*, 988 F.3d 1148, 1152 (9th Cir. 2021). "[P]ublic

26 injunctive relief under the UCL, the CLRA [Consumer Legal Remedies Act], and the false

27 advertising law is relief that has 'the primary purpose and effect of' prohibiting unlawful acts that

28 threaten future injury to the general public." *McGill*, 2 Cal. 5th at 955 (quoting *Broughton v. Cigna*

1   *Healthplans of California*, 21 Cal. 4th 1066, 1077 (1999)); *see DiCarlo*, 988 F.3d at 1152 (citing

2   *McGill*, 2 Cal. 5th at 955) ("Public injunctive relief is 'relief that by and large benefits the general

3   public . . . and that benefits the plaintiff, if at all, only incidentally and/or as a member of the general

4   public.'"). In *McGill*, the California Supreme Court held that no one can contractually waive all

5   rights to seek public injunctive relief. *McGill*, 2 Cal. 5th at 962. Thus, any contract that bars public

6   injunctive relief in both court and arbitration is invalid. (*Id.*); *Prostek*, 662 F. Supp. 3d at 1118 ("It

7   is true that an arbitration agreement (or any other contract) cannot waive a plaintiff's right to seek

8   a UCL public injunction in any forum.").

9        Here, the arbitration agreement authorizes a party to seek public injunctive relief as

10   expressly authorized by statute. (Doc. 5-1, Ex. A at 9; Ex. B at 14; Ex. C at 17-18). ("Class Action

11   Waiver. You give up your right to participate in a class action. This means that you may not (i) be

12   a representative or member of any class of claimants, (ii) or act as a private attorney general, except

13   to seek public injunctive relief expressly authorized by statute.") (emphasis removed). Because the

14   arbitration agreement at issue does not "purport to waive [a party's] right to request in any

15   forum … public injunctive relief," the rule under *McGill* is not implicated. *McGill*, 2 Cal. 5th at

16   961.

17                    b.    Under *Hodges*, Plaintiff's Class Claims Seek Public Injunctive

18                          Relief

19        The Court now turns to whether Plaintiff's class claims seek public injunctive relief. The

20   Ninth Circuit addressed in length the matter of public injunctive relief in *Hodges*. *Hodges v.*

21   *Comcast Cable Communications, LLC*, 21 F.4th 535 (9th Cir. 2021). In *Hodges*, plaintiff, a former

22   cable subscriber, brought a putative class action against cable provider Comcast Cable

23   Communications ("Comcast"), challenging certain of Comcast's privacy and data collection

24   practices under various causes of action, including under the California UCL. *Hodges*, 21 F.4th at

25   538. Hodges sought, among other things, seven specified forms of "statewide public injunctive

26   relief" against Comcast for violating the class members' statutory privacy rights in collecting data

27   about subscribers' cable television viewing activity and personally identifiable demographic data

28   about its subscribers. (*Id.*). Comcast sought to appeal the district court's denial of its motion to

compel arbitration of the claims asserted against it, reasoning that plaintiff's requested relief was not "public injunctive relief" such that it did not trigger the *McGill* rule's invalidation of a contract provision purportedly waiving the right to seek public injunctive relief in all forums.  (*Id.*).  Thus, the issue before the Court was whether the plaintiff's requested relief was public injunctive relief for purposes of the *McGill* rule.  (*Id.*).  The Ninth Circuit reversed the district court's denial of Comcast's motion to compel and held that the relief plaintiff sought was not public injunctive relief, the *McGill* rule did not apply, and the arbitration agreement should have been enforced.  (*Id.*).

In so doing, the Ninth Circuit clarified the test for whether the *McGill* contract-invalidation rule applies begins with determining whether the complaint appears to seek public injunctive relief.  (*Id.* at 540).  "In addressing whether the contract in [*McGill*] was unenforceable, the California Supreme Court stated that, in 'answering this question, we *first* conclude that McGill's complaint does, in fact, appear to seek … public injunctive relief."  (*Id.*) (quoting *McGill*, 2 Cal. 5th at 956); *see Mejia v. DACM Inc.*, 54 Cal. App. 5th 691, 702-06 (2020) (California Court of Appeal began analysis of applicability of *McGill* rule by addressing whether the operative complaint actually sought public injunctive relief in the first place).  The Ninth Circuit held that this initial inquiry whether public injunctive relief is sought must be addressed before reaching grounds of contract invalidation under either the *McGill* rule or the similar *Broughton-Cruz* rule, which invalidates agreements to arbitrate claims for public injunctive relief under certain California consumer statutes.  (*Id.* at 540-41); *see Kilgore v. KeyBank, N.A.*, 718 F.3d 1052, 1060-61 (9th Cir. 2013) (en banc) (concluding that the requested injunctions at issue did not involve public injunctive relief, thus the *Broughton-Cruz* rule was not implicated, and arbitration was therefore required); *see also Clifford v. Quest Software Inc.*, 38 Cal. App. 5th 745, 755 (2019) (holding that the relevant cause of action did not seek public injunctive relief and that arbitration therefore could be compelled without addressing whether the *Broughton-Cruz* rule was preempted).  Thus, when grounds of contract invalidation are raised under either *McGill* or *Broughton-Cruz*, courts should first determine whether public injunctive relief is stated.  *Hodges*, 21 F.4th at 540-41.  As detailed above, the Court finds that *McGill* is not implicated against the instant arbitration agreement as the parties do not dispute the agreement expressly authorizes a party to seek public injunctive relief by statute.

1    The remaining issue is "what constitutes non-waivable public injunctive relief under
2    California law[,]" for which the Ninth Circuit set forth standards in *Hodges*.  *Hodges*, 21 F.4th at
3    541.  The Ninth Circuit explained *McGill*'s rule against waiver of public injunctive relief derived
4    from California Civil Code Section 3513, which provides: "Any one may waive the advantage of
5    a law intended solely for his benefit.  But a law established for a public reason cannot be
6    contravened by a private agreement."  (*Id.*) (citing *McGill*, 2 Cal. 5th at 961); (*see id.*) ("Because
7    the primary consumer protection laws at issue in *McGill*—*i.e.*, the UCL; . . . and California's false
8    advertising law[]—all authorize injunctive relief that is primarily 'for the benefit of the general
9    public,' [] the *McGill* court held that any waiver of the 'right to request in any forum such public
10   injunctive relief . . . is valid an unenforceable under California law.") (citation omitted).
11   "Consistent with California Civil Code § 3513's distinction between relief for the benefit of private
12   individuals and relief for the benefit of the general public as a whole, . . . California law
13   distinguish[es] between private injunctive relief—*i.e.*, relief that primarily resolves a private
14   dispute between the parties and rectifies individual wrongs and that benefits the public, if at all,
15   only incidentally—and public injunctive relief—*i.e.*, relief that by and large benefits the general
16   public and that benefits the plaintiff, if at all, only incidentally and/or as a member of the general
17   public." (*Id.*) (citing *McGill*, 2 Cal. 5th at 955).

18   Non-waivable public injunctive relief includes three key features.  (*Id.* at 541).  First, it has
19   the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general
20   public.  (*Id.* at 541-42) (citation omitted).  "[I]n contrast to relief aimed at 'redressing or preventing
21   injury' to a person or group of persons, [] forward-looking relief that generally aims to prevent
22   unlawful conduct in the future is more likely to be characterized as reflecting statutory rights that
23   are 'established for a public reason.'" (*Id.*) (citing Cal. Civ. Code § 3513).  Second, a request for
24   public injunctive relief does not constitute the pursuit of representative claims or relief on behalf
25   of others, nor does it involve prosecuting actions on behalf of the general public.  (*Id.* at 542).
26   "[T]he requirement that an action be brought as a class action has never been imposed with regards
27   to requests to enjoin future wrongful business practices that will injure the public." (*Id.*) (citation
28   omitted).  And third, public injunctive relief involves diffuse benefits to the general public as a

14

1   whole, in contrast to private injunctive relief, which provides benefits to an individual plaintiff—

2   or to a group of individuals similarly situated to the plaintiff.  (*Id.*) (citation and emphasis removed).

3           Thus, public injunctive relief "is limited to forward-looking injunctions that seek to prevent

4   future violations of law for the benefit of the general public as a whole, as opposed to a particular

5   class of persons, and that do so without the need to consider the individual claims of any non-

6   party."  (*Id.*); (*see id.*) ("The paradigmatic example would be the sort of injunctive relief sought in

7   *McGill*[], where the plaintiff sought an injunction against the use of false advertising to promote a

8   credit protection plan.").  Public injunctions do not require effectively fashioning individualized

9   relief for non-parties.  (*Id.*); *see, e.g., Cruz v. PacifiCare Health Systems, Inc.*, 30 Cal. 4th 303, 308-

10  09 (2003) (plaintiff-insured sought public injunctive relief against defendant-health insurer's false

11  advertising in misrepresenting or failing to disclose internal policies that lower the quality of

12  services provided, which induced persons to subscribe to health plans); *Broughton*, 21 Cal. 4th at

13  1073 (Medi-Cal recipients sought public injunctive relief under the CLRA against defendant-health

14  insurer's deceptive and misleading advertising of the quality of medical services which would be

15  provided under its health care plan).

16          By contrast, injunctive relief being sought for the benefit of a discrete class of persons or

17  would require consideration of the private rights and obligations of individual non-parties, is held

18  to be private injunctive relief.  *Hodges*, 21 F.4th at 543; *see, e.g., Kilgore*, 718 F.3d at 1056 & n.3

19  (en banc, holding that plaintiffs were not seeking public injunctive relief because the requested

20  injunction under the UCL against enforcing student loan notes or reporting associated loan defaults

21  on credit reports plainly would benefit only the approximately 120 putative class members, and not

22  the general public, and was related only to past harms suffered by the members of the limited

23  putative class); *Clifford v. Quest Software, Inc.*, 38 Cal. App. 5th 745, 753-54 (2019) (injunctive

24  relief seeking to prevent employer from committing a variety of wage and hour violations from the

25  alleged misclassification of employees as "exempt," though prospective, was not "public" when

26  the primary beneficiaries, defendant's current employees, were a defined group of similarly situated

27  persons and not the public at large).

28          Plaintiff contends throughout his opposition that he seeks on behalf of himself and others

"a public injunction against Defendant[.]"  (Doc. 7 at 2); (*Id.* at fn. 1) ("The injunctive relief component of this case is critical, because Defendants' conduct not only affects Plaintiff, but consumers throughout the State of California, as demonstrated by the UCL claim."); (*id.* at 3) ("arbitration cannot be granted for Plaintiff's UCL claims which provide for public injunctive relief, and for which he seeks public injunctive relief, as alleged in his Complaint.").  But as Defendant points out, the word "public" appears nowhere in the complaint.  *See* (Doc. 10 at 3).  Defendant further argues the complaint expressly mentions injunctive relief twice: in the class action allegations, (Doc. 1-1 ¶ 58(e)) ("Whether Plaintiff and Class Members are entitled to equitable and/or injunctive relief[]"), and within the California False Advertising Act claim wherein Plaintiff alleges risk of future harm to himself and the class members.  (*Id.* at ¶ 76) ("The misleading and false advertising described herein presents a continuing threat to Plaintiff and Class Members . . . that will continue to cause irreparable injury to consumers unless enjoined or restrained."); (*id.* at ¶ 77) ("Plaintiff is at risk of suffering harm in the future given that he intends to purchase another vehicle.  Plaintiff is entitled to preliminary and permanent injunctive relief ordering Defendant to cease their false advertising, as well as disgorgement and restitution and all Class Members[.]").

However, Defendant overlooks other aspects of Plaintiff's complaint that tend to corroborate his assertion that he broadly seeks injunctive relief to benefit the public.  For example, in the opening paragraph of the class action complaint, Plaintiff asserts that he seeks to "stop Defendant's practice of falsely advertising that all of their vehicles undergo a rigorous '125 point inspection', when those inspections are not actually being done, thereby misleading a class of consumers ("Class Members") who would not have purchased their vehicles but for this advertisement."  (*Id.* at ¶ 1).  And under his UCL claim, Plaintiff asserts that "Plaintiff and Class Members seek an order requiring Defendant to immediately cease such acts of unlawful, unfair, and fraudulent business practices and requiring Defendant to correct its actions."  (*Id.* at ¶ 94).

Plaintiff's requested relief—that Defendant be enjoined from further falsely advertising the completion of 125+ point inspections on its vehicles for sale—seeks "forward-looking prohibitions against future violations of law[,] [b]ut as [*Hodges*] explained, that alone is not enough to classify the remedy as public injunctive relief[.]"  *Hodges*, 21 F.4th at 549.  Courts also must look to whether

1  Plaintiff's requested relief on its face stands to benefit only a "group of individuals similarly

2  situated to the plaintiff" or the general public as a whole. (*Id.*) (citing *McGill*, 2 Cal. 5th at 955).

3       In *Lee v. Tesla, Inc.*, putative class plaintiffs, who were owners of various Tesla vehicles,

4  alleged among other things a California state law claim for permanent public injunctive relief

5  against Tesla's misleading marketing of the safety of the vehicles which posed a significant harm

6  to the general public. *Lee v. Tesla, Inc.*, No. SACV20-00570JVS(KESx), 2020 WL 10573281, at

7  *1-2 (C.D. Cal. Oct. 1, 2020). Specifically, plaintiffs sought to "protect the general public from

8  Tesla's false advertisements and omissions—including Tesla's ongoing claims that its vehicles are

9  the safest production vehicles on the road, not capable of sudden uncommanded acceleration"—

10 which plaintiffs alleged resulted in vehicular accidents. *Id.* *2-3. The court found that the relief

11 sought against Tesla's misleading marketing practices was public injunctive relief, which is

12 separate from the private relief sought in economic damages. *Id.* at *7. The court further found

13 that while the requested relief was brought on behalf of the putative class members, the relief sought

14 would likely benefit the public, and not solely the putative class. (*Id.*); accord *Nguyen v. Tesla,*

15 *Inc.*, No. 8:19-cv-01422-JLS-JDE, 2020 WL 2114937, at *4 (C.D. Cal. Apr. 6, 2020) (finding

16 public injunctive relief stated where plaintiffs' requested injunction seeks to address the public

17 harm in Tesla's misleading advertising of its used vehicles as having a certain battery range or as

18 "certified" that is relied upon by consumers, including plaintiffs and the putative class).

19      Here, Plaintiff seeks to enjoin Defendant's false advertising of multi-point inspections of

20 its vehicles for sale, a "representation [that] is of particular value to consumers, like Plaintiff,"

21 (Doc. 1-1 ¶ 3). Such false representation to consumers similarly poses significant harm to the

22 general public. *See Hodges*, 21 F.4th at 549 ("The relief sought here is [] the equivalent of a simple

23 prohibition on the running of a false advertisement[.]"). Prospective consumers seeking to purchase

24 a vehicle that is advertised under false or misleading promises—whether as one of the "safest

25 vehicles on the road" as in *Lee*, "certified" with a particular battery range as in *Nguyen*, or with a

26 guaranteed 125+ point inspection as Defendant allegedly advertises—may be induced to purchase

27 the vehicle or rely on those misleading claims to their detriment. Though the relief Plaintiff seeks

28 is on behalf of the putative class of consumers who have purchased a vehicle from CarMax that

was advertised to have undergone a 125+ point inspection, the relief sought is not limited to a "discrete class of persons" or identifiable number of putative class members as in *Kilgore* or *Clifford*, and "would likely benefit [the public]" from purchasing vehicles based on the false advertisement. *Lee*, 2020 WL 10573281, at *7; *see Hodges*, 21 F.4th at 543. The Court finds Plaintiff's requested relief seeking to enjoin Defendant's practice in falsely advertising 125+ point inspections on vehicles for sale when those inspections have not been done is public injunctive relief.

Because the arbitration agreement permits a party to seek public injunctive relief expressly authorized by statute, as are Plaintiff's claims under the UCL and the false advertising law insofar as they seek to enjoin Defendant's false advertisements, the Court determines these claims should be decided in a judicial forum. *Lee*, 2020 WL 10573281, at *9; *see Broughton*, 21 Cal. 4th at 1088 (severing CLRA public injunctive relief action to be decided in a judicial forum while private relief sought in damages and malpractice claim proceed to arbitration).

### C.      Request to Stay the Action Pending Arbitration

Defendant requests that the Court stay this action pending arbitration. (Doc. 5 at 10.) The FAA requires that "on application of one of the parties [the Court] stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *Smith*, 601 U.S. at 477. A trial court may grant a stay "pending resolution of independent proceedings which bear upon the case" where "it is efficient for [the court's] own docket and [is] the fairest course for the parties." *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979).

The Court will stay the instant action pending the arbitration proceedings of Plaintiff's remaining, arbitrable individual claims. *See Nguyen*, 2020 WL 2114937, at *6 (finding a stay is mandatory as to plaintiffs' individual, arbitrable claims, and is proper as to non-arbitrable requests for public injunctive relief under the CLRA, UCL, and FAL); *Lee*, 2020 WL 10573281, at *10 (finding general stay of proceedings appropriate).

///

///

1    **IV.    CONCLUSION AND ORDER**

2          Having found that the parties formed a valid arbitration agreement and that the issue of

3    scope was delegated to the arbitrator, **IT IS HEREBY ORDERED:**

4          1.   Defendant's motion to compel arbitration and stay the instant case pending completion

5               of the arbitration process (Doc. 5) is **GRANTED IN PART** to the extent of compelling

6               arbitration of Plaintiff's individual claims but declining to compel arbitration of

7               Plaintiff's requests for public injunctive relief;

8          2.   This case is **STAYED** pending completion of arbitration; and

9          3.   The Parties are **DIRECTED** to submit a joint status report outlining the results of the

10              arbitration and the need for further proceedings 90 days from the date of this order and

11              every 90 days thereafter or within 30 days of the completion of arbitration, whichever

12              is sooner.

13   IT IS SO ORDERED.

14      Dated:   __**January 13, 2025**__                    _____

15                                                           UNITED STATES MAGISTRATE JUDGE

19